IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NICHOLAS DAINIAK, M.D. )
)
Plaintiff, )
)
v. ) No.: _____
) Judge: _____
OAK RIDGE ASSOCIATED ) JURY DEMAND
UNIVERSITIES ("ORAU"), )
)
Defendant. )

---

**COMPLAINT**

---

COMES NOW, the Plaintiff, NICHOLAS DAINIAK, M.D., and he sues the Defendant, and for cause of action would show unto this Honorable Court as follows:

1. Plaintiff, Nicolas Dainiak, M.D., is a resident of Florida.

2. Defendant, ORAU, is a nonprofit corporation authorized to do business in Tennessee with its principle place of business located at, 100 ORAU Way, Oak Ridge, Tennessee, 37830-6209, and may be served with process through its Registered Agent, Rachel F. Lokitz, 100 ORAU Way, Oak Ridge, Tennessee, 37830-6209.

3. Jurisdiction is founded upon 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: Age Discrimination and Employment Act, 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12102, *et seq.*, and pursuant to the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is proper under the code provisions cited herein, and 28 U.S.C. § 1391.

4. The Defendant is an employer engaging in an industry affecting commerce.

5. The Defendant employs more than twenty (20) employees, and more than eight (8) employees in the State of Tennessee.

6. The Defendant is an employer subject to the provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

7. The Defendant is an employer within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

8. The Defendant is an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101.

9. At all times stated herein, the Defendant was an employer subject to the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103.

10. The Americans with Disability Act, 42 U.S.C. § 12101, *et seq.*, defines "disability" as follows:

1.) Disability: The term "disability" means, with respect to an individual-
  A.)  a physical or mental impairment that substantially limits one or more major life activities of such individual;
  B.) a record of such an impairment; or
  C.) being regard as having such an impairment (as described in paragraph (3)).

2.) Major Life Activities:
  A.) In general
    For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
  B.) Major bodily functions
    For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.
  C.) An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

11. Equal Employment Opportunity Commission's (hereinafter "EEOC") regulations

2

define "impairment," in part, as:

"(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems, neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; …" 29 C.F.R. § 1630.2 (emphasis added).

12.     EEOC's regulations define "major life activities," in part, as including, but not limited to:

"(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentration, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2 (emphasis added).

13.     Plaintiff was hired by the Defendant on March 2, 2015 as the Medical and Technical Director of the Radiation Emergency Assistance Center and Training Site ("REAC/TS") in Oak Ridge, Anderson County, Tennessee.

14.     At the time of his hire, Plaintiff was 67 years old.

15.     At the time of his hire, Plaintiff anticipated working at least ten (10) additional years, as long as he remained in good health.

16.     Prior to hiring the Plaintiff, Defendant started recruiting Plaintiff in 2012.

17.     Plaintiff was highly qualified for the position of Medical and Technical Director of REAC/TS. (A copy of Plaintiff's C.V. is attached hereto as Exhibit 1).

18.     REAC/TS is part of the Oak Ridge Institute for Science and Education ("ORISE"), a Department of Energy ("DOE") entity that had been managed by Defendant for many years.

3

19. In 2015, REAC/TS was vital to Defendant's continued success in achieving a renewal of its DOE contract, which includes the management of REAC/TS.

20. REAC/TS is a unique radiation assessment and medical response unit in the United States and the world.

21. As Plaintiff was being recruited, REAC/TS was described to him as "the jewel in the crown" of Defendant by Daniel W. Standley, the then-Director of Human Resources, and by Albert Wiley, MD, the then-Medical and Technical Director.

22. However, at the time of Plaintiff's hire, REAC/TS was in disarray.

23. At the time of Plaintiff's hire, REAC/TS staff suffered from low morale.

24. At the time of Plaintiff's hire, REAC/TS was operating on a negative budget.

25. At the time of Plaintiff's hire, REAC/TS staff had a poor academic publication record.

26. At the time of Plaintiff's hire, REAC/TS had a lack of leadership sufficient to allow it to respond to the needs of both DOE and Defendant.

27. At the time of Plaintiff's hire, Defendant's contract with DOE was up for bid.

28. At the time of Plaintiff's hire, it was unclear among Defendant's leadership that the re-competition for the DOE contract to manage ORISE would be successful.

29. After the Plaintiff was hired as Medical and Technical Director of REAC/TS, he focused efforts to improve the morale, correct the budget, and enhance efficiency of the daily operations of REAC/TS.

30. After the Plaintiff was hired, he also worked to help Defendant win the bid for the management contract with DOE.

31. After Plaintiff was hired, he effectively assisted in Defendant's efforts with DOE

4

to be awarded the DOE contract.

32. After Plaintiff was hired, Defendant was successful in winning the contract to continue managing ORISE and, on or about January 1, 2016, received a $1.4 billion contract from the DOE.

33. Prior to employment with Defendant, for over 20 years, Plaintiff held the academic rank of Professor at Yale University.

34. Prior to employment with Defendant, for over 20 years, Plaintiff held an academic appointment in the Yale University School of Medicine.

35. Prior to employment with Defendant, Plaintiff had conducted research in the Yale Cytogenetics Bio-dosimetry Laboratory that Plaintiff had helped develop.

36. With the knowledge and approval of Defendant, after being hired by Defendant, Plaintiff maintained this academic appointment, and he continued conducting research at the Yale Cytogenetics Bio-dosimetry Laboratory.

37. Retaining his position at Yale and continuing his research at the Yale Cytogenetics Bio-dosimetry Laboratory were conditions of Plaintiff's acceptance of employment with Defendant, and this was agreed to by Defendant prior to Plaintiff being hired.

38. After Plaintiff was hired, he reported initially to David Hackemeyer, VP and Director, National Security & Emergency Management during 2015-2016 (for about 1 year).

39. During the time Plaintiff reported to David Hackemeyer, Mr. Hackemeyer was an agent and employee of Defendant.

40. Plaintiff, thereafter, reported to Dr. Donna Cragle, SVP and Program Director, Health, Energy and Environment ("HEE") in 2016-2018 (for about 2 years).

41. At all times stated herein, Dr. Donna Cragle was an agent and employee of

5

Defendant.

42.     Plaintiff continued to report to Dr. Donna Cragle up to the date of Plaintiff's termination on May 16, 2018.

43.     As of 2016, it was made clear to Plaintiff by Defendant's leadership that ORAU wanted Plaintiff to help get Yale University to be a sponsoring institution of Defendant.

44.     After being approached by ORAU's University Partnerships Office ("UPO"), Plaintiff worked diligently with the Yale Provost for Science and the Yale Physics Department to make Yale the first Ivy League sponsoring institution of Defendant in 2017.

45.     Yale University became a sponsoring institution of Defendant in 2017 due primarily to the Plaintiff and his efforts.

46.     During Plaintiff's employment with Defendant, Plaintiff's job was basically 24 hours a day, 7 days a week, and 365 days a year.

47.     Additionally, Plaintiff's job required extensive travel, both domestic and international.

48.     The Plaintiff had significant business travel during his employment with Defendant.

49.     Attached hereto as Exhibit 2 is a true and accurate copy of the Defendant's Travel Manual.

50.     Pursuant to the Defendant's Travel Manual (Exh. 2), there are three levels of responsibility when it comes to travel:

2.0 RESPONSIBILITIES
*2.1 Traveler*
The traveler is responsible for the following:
- Complying with applicable policy or guidelines specified in this manual (including DOE foreign travel and conference requirements).
- Ensuring that the purpose for the travel is appropriate.

6

- Considering the most cost-effective routing and means of accomplishing official business (e.g., electronic mail, mail, teleconferencing versus travel).
- Initiating the travel pre-approval authorization request and securing the necessary approvals prior to travel.
- Submitting a Request for Approval of Foreign Travel (RAFT) form if the travel meets the requirements set forth by DOE and the criteria of the DOE Foreign Travel Order 551.1D.
- Verifying the confirmed rates with hotels and rental car agencies during travel.
- Completing and submitting the travel expense report and required documents for reimbursement within 10 days of completion of travel.

The traveler shall exercise good business judgment with respect to any travel expenses and spend ORAU's funds as carefully and judiciously as he/she would spend his/her own funds.

*2.2 Travel Approver*

The approver is responsible for the following:
- Complying with applicable policy or guidelines specified in this manual (including DOE foreign travel and conference requirements)
- Verifying that all costs are allowable.
- Ensuring that the purpose for travel is appropriate.
- Assuring that the most cost-effective routing and means of accomplishing official business (e.g., electronic mail, mail, teleconferencing versus travel) are considered.
- Verifying the information provided on the pre-approval authorization and travel expense report.
- Ensuring that the RAFT form is completed if the travel meets the requirements set for the by DOE, including safety and the criteria of the DOE Foreign Travel Order 551.1D.
- Notifying all appropriate offices, including Occupation Health for all employee and employee-participant foreign travel.

*2.3 Financial Operations*

Financial Operations (FinOps) is responsible for the following:
- Overseeing the day-to-day operation of the travel functions.
- Implementing, administering, and applying the established travel policies and procedures.
- Providing travel services for hotel and transportation reservations.
- Coordinating all requests for DOE/Strategic Partnership Projects (SPP) foreign travel and obtaining DOE approval.
- Coordinating among and resolving problems with travel services providers.
- Administering the company travel credit cards.
- Issuing payments for cash advances, advance payment of registration fees, hotel deposits, etc.

7

- Coordinating all requests for DOE Conference attendance and obtaining DOE approval.
- Auditing foreign and domestic travel reimbursements within 10 days.
- Coordinating all accounting related to travel.

(*See* Exh. 2).

51. During his employment with Defendant, Plaintiff's supervisors were aware that he had three homes, one in Connecticut, one in Florida, and an apartment in Tennessee, and Plaintiff was specifically authorized to work out of any of these residences. As a result, Plaintiff did not have an assigned home for travel reimbursement purposes.

52. After working at REAC/TS for about three months, Daniel W. Standley, the then-Director of Human Resources (who reported directly to CEO Harry A. Page), asked Plaintiff about his retirement plans.

53. Daniel Standley acted surprised when Plaintiff told him that when he was hired he intended working for another ten (10) years or longer.

54. At the time of the conversation set forth in the above Paragraph, Daniel W. Standley was an agent and employee of Defendant.

55. At all times stated herein, CEO Harry A. Page was an agent and employee of Defendant.

56. As Plaintiff learned later, at the time of his hire, Defendant anticipated that Plaintiff would be employed for less than five (5) years because this was, in their minds, sufficient time to (1.) have a successful re-competition for the DOE contract, (2.) correct the numerous deficiencies within REAC/TS, (3.) establish the liaison with Yale University, and (4.) properly train and mentor his replacement, Dr. Carol J. Iddins, the then-Associate Director of REAC/TS whose management experience was limited to time spent in the military and whose publication record needed to be improved with more focus in radiation topics.

8

57.     During his employment, Plaintiff had many successes and accomplishments while at REAC/TS.

58.     Plaintiff's accomplishments in 2015 included, but are not limited to, the following:

- Implemented a tiered reporting structure with accountability, established better defined roles for senior staff, established regular staff meetings, and personally motivated personnel at every level, resulting in a dramatic improvement in low morale that had existed at REAC/TS for several years.
- Established a "lead by example" approach for others to follow. Initiated focused mentoring of the Associate Director (Dr. Iddins), the laboratory director (Dr. Balajee) and the Business Manager (Dr. Jenkins).
- Changed the attitude of entire staff from inward hibernation to outward cooperation with other ORAU departments and laboratories, other DOE/NNSA programs, and other USG departments and agencies to explore new opportunities.
- Transitioned subject matter expertise and international reputation as a thought leader in the field radiation biology and radiation response to REAC/TS, published several manuscripts in peer-reviewed journals, and established the importance of research and academic excellence for the REAC/TS staff.
- Identified long history of budget shortfalls and developed a strategy to reduce expenses and create long-term stability through enhanced work for others.
- Enhanced dialogue and communications with DOE (customer) by meeting with leadership in Washington D.C.
- Worked intensively with entire ORISE Team on successful presentations for competitive renewal of the DOE/ORAU contract.

59.     Plaintiff's accomplishments in 2016 included, but are not limited to, the following:

- Functionally integrated REAC/TS into ORISE under its new leadership (Dr. Vosburg) and motivated an apprehensive staff to transition from its reporting structure in National Security and Emergency Management (NS) (Dr. Hackemeyer) to the Health Energy and Environment (HEE) Department (Dr. Cragle). This major change in reporting structure transformed the weekly schedule of meetings and social events for REAC/TS staff. During this process, two REAC/TS leaders were recognized as "Thought Leaders" by ORAU, both of whom required support and encouragement to integrate.
- Developed all levels of staff through (1) enhanced motivation, (2) increased communications within and outside REAC/TS, and (3) academic success, resulting in their now "thriving" at REAC/TS. Encouraged by Dr. Cragle to focus on development of the "next generation" of REAC/TS leaders, a more focused mentoring program was developed. As part of this program, assigned additional responsibilities to staff leaders commensurate with their demonstrated performance.
- Developed a robust relationship with new leadership at the National Nuclear Security Administration (NNSA) (NA-81). Maintained excellent working relationships with all levels at DOE (NA-84 and Au-10). Met with senior DOE leadership in Washington D.C. and at REAC/TS (General Klotz, Dr. Tilden and Dr. Blumenthal). The visits to REAC/TS were

9

recognized as contributing to a "stellar" year for communications with ORAU's primary customer.

- Balanced the REAC/TS FY16 budget, and met with ORAU finance team to better understand budgeting process.
- Drove research success at REAC/TS by creative scientific thinking, concentrating the efforts at the Cytogenetics Biodosimetry Laboratory (CBL), and organizing/motivating the CBL Director (Dr. Balajee) to obtain funding for Technology Innovation (TI) through DOE, and for basic and applied research through ORAU's ODRD program.
- Began the process of developing a CBL network in the US by developing a business plan that was presented at the Biomedical Advanced Research Authority (BARDA) in Washington D.C.
- Evaluated as "exemplifying what a fully rounded thought leader should be," and as "not just talking the talk but walking the walk".
- At the request of ORAU leadership, successfully managed the integration of Yale University into ORAU, the first Ivy League institution to do so.

60. Plaintiff's accomplishments in 2017 included, but are not limited to, the following:

- Developed a positive budget for REAC/TS through an extensive work for others program, successful research grants and TI projects, and close monitoring of expenses.
- Mentored the Associate Director (Dr. Iddins) on the management level (regarding effective management of difficult employees) and on the academic level (providing the opportunity for her to supplant himself in some international meetings to which he was invited as a keynote lecturer). Encouraged Dr. Iddins to take an on-line leadership course (Columbia University), as she expressed a hunger for acquiring executive skills, and declared that becoming the Director was her long-term career goal. Mentored Dr. Balajee in delegation and efficiency in order to improve research productivity and operational success. Mentored Dr. Jenkins in improvement of communications within REAC/TS and throughout ORAU in order to enhance his impact in planning and budgeting.
- Published six peer-reviewed papers as part of a new global recognition of REAC/TS as an academic leader in radiation medicine, clinical management and emergency response. Presented papers at the World Health Organization (WHO) (Geneva), Nuclear Medicine Defence Conference (Munich), and NASA as part of its Mars 2020 Mission (Kennedy Space Center, FL). Lectured on assessment and communication of radiation risk in the International Atomic Energy Agency's (IAEA) special meeting in Seoul, and participated in WHO's exercise (Hungary) involving 82 countries and hundreds of participants.
- As part of her mentoring program, Plaintiff delegated exercise work to Dr. Iddins while Plaintiff lectured at an International Medicine course in Israel, asked her to present at an Occupational Medicine conference at NASA, and to present at a meeting in Japan (Nagasaki) to broaden her limited experience. Also agreed to have Dr. Iddins participate as the REAC/TS representative in the ORISE Academy to gain a better understanding of ORAU operations, and bring this information back to REAC/TS for presentation at staff meetings.
- Drafted a Statement and White Paper for the establishment of a U.S. Individual Biodosimetry Network for the National Council for Radiation Protection and Measurements (NCRP). Presented this material to two Program Action Committees at the annual NCRP meeting, Washington D.C. in March 2018.

10

- Recognized as understanding "the importance of networking within the ORAU organization" and "taking time to meet with key DOE sponsors in Washington, D.C." Continued to learn about the ORAU budget process "in spite of a grueling national and international travel schedule."

61. Plaintiff's accomplishments in 2018 prior to his termination included, but are not limited to, the following:

- Set parameters for increased revenue stream with a projected positive impact on REAC/TS budget by developing additional work for REAC/TS at NNSA through expansion of REAC/TS involvement in education of NATO radiation experts on emergency medical response, and through work for the Department of State through its GSNP.
- Educated the Associate Director, Dr. Iddins, on dealing with a difficult employee.
- Provided more structured approach for Dr. Iddins to develop her academic reputation by suggesting 5 research projects, 2 of which she already has collected preliminary data.
- Focused Dr. Balajee on (1) automation in preparation for competitive renewal of Technology Innovation awards in 2018, and (2) developing specific aims for a NIH grant proposal on chromosome territories in continuance of ODRD seed funding, in lines with the ODRD program objectives.
- Laid foundation for emergency medical response planning for NASA's 2020 Mars Mission by visiting emergency responders and subject matter experts in the Orlando area hospitals (Parrish Hospital, Orlando Medical Center and Holmes Hospital).
- Presented objectives and timeline for development of emergency response program at Kennedy Space Center for the 2020 Mars Mission.
- Advanced objectives of US Global Security and Nonproliferation Programs through its Global Center for Nuclear Energy Partnership (GCNEP) by participating in IARPIC 2018 Meeting in India and the Bhabha Atoimic Research Center (BARC) Biodosimety Program Workshop in Mumbai, India.
- Initiated molecular project to leverage mathematical modeling to understand proximal intercellular interactions after exposure to ionizing radiation.
- Published significant papers on (1) use of Systems Biology approaches to meld the fields of experimental radiobiology and radiation epidemiology; (2) proposed guidelines for antimicrobial management of infections in mass casualty incidents involving radioactive materials; and (3) spatial organization of chromosome territories.
- Invited by the American Academy of Health Physics to speak at the 62nd HPS Annual Meeting on topic of Expectations for Health Physicists Working in U.S. Hospitals.

62. During his employment, Plaintiff received annual Blue/Yellow/Green Coaching Worksheets from the Defendant, and his last described him as:

1. In spite of a brutal, grueling travel schedule, gives priority to ORAU administrative duties;
2. Stays up to date on not only major but also small requirements of the job;
3. Always thinks of ways to develop junior staff who thrive under Plaintiff's leadership;

11

4. Works with Dr. Carol J. Iddins on both a management level (to deal with employee issues) and intellectual experience level (to have her present for Plaintiff at international meetings to which he was invited);
5. Forges strong relationships not only within ORAU but also with its sponsors (particularly DOE);
6. Not only talks the talk but also walks the walk;
7. Enhances the academic reputation of REAC/TS through multiple publications and presentations;
8. Constantly has new ideas and creativity in support of research at REAC/TS;
9. Assures radiation readiness through exercises with the DOE, IAEA, NASA and other organizations; and
10. Understands the importance of networking both within and outside of ORAU.

(A Copy of the "Blue Coaching Worksheet", dated April 20, 2018, is attached as Exhibit 3).

63. After Plaintiff was hired up to the date of his termination, Dr. Carol J. Iddins reported to Plaintiff.

64. At all times stated herein, Dr. Carol Iddins was an agent and employee of Defendant.

65. During the time Plaintiff was employed, he was repeatedly encouraged by his supervisors to train and mentor the Associate Director, Dr. Carol J. Iddins.

66. Dr. Carol J. Iddins is substantially younger than Plaintiff.

67. It was well-known to management, including CEO, Harry Page, and his supervisor, Dr. Donna Cragle, that Dr. Iddins' goal was to become the Director of REAC/TS.

68. When Plaintiff was hired, it was generally known that Dr. Iddins' goal was to become the Director of REAC/TS, but at the time Plaintiff was hired, it was acknowledged by herself and management that she was not yet ready to become Director.

69. When Plaintiff was hired, it was generally known that before Dr. Iddins could become Director of REAC/TS, she needed training, mentoring and development.

70. Dr. Iddins' goal of becoming Director of REAC/TS was announced to Plaintiff by Dr. Iddins soon after his arrival, and support for her stated goal was acknowledged by several

12

management level employees at ORAU, including CEO, Harry Page, and Plaintiff's last supervisor, Dr. Donna Cragle.

71. During his employment, Plaintiff learned that the CEO, Harry A. Page and Dr. Carol Iddins had developed a close relationship.

72. During the last two annual Holiday Celebrations, Dr. Carol Iddins and her husband sat at the table with CEO, Harry Page and his wife.

73. During his employment, Plaintiff learned that Dr. William J. Vosburg, SVP and Director of ORISE, wished for Dr. Carol Iddins to be named a participant in the ORISE Academy that was established to train the future leadership of Defendant.

74. At all times stated herein, Dr. William J. Vosburg was an agent and employee of Defendant.

75. During Plaintiff's employment, he gave Dr. Carol Iddins three written evaluations. The first 2015 evaluation was basically overall good; and the 2016 evaluation was also basically overall good but contained more significant suggestions for improvement. However, in the 2017 evaluation, given to her on February 1, 2018, the Plaintiff indicated that he was not satisfied with Iddins' performance in several areas, including academic performance.

76. After receiving the evaluation in 2018, Dr. Carol Iddins was disappointed and upset with the evaluation, and thereafter, she stopped being friendly to the Plaintiff, curtailing her communications with the Plaintiff.

77. Additionally, the Plaintiff would prepare a succession plan evaluation each year, and in this he would indicate therein Dr. Carol Iddins' readiness or suitability to succeed him as Director. In the first year in December, 2015, (just nine months after he joined ORAU), he indicated that she needed to develop into a strategic thinker rather than a logistics person, and that

13

she needed to develop academic expertise in a specific area of radiation medicine. By the second succession plan evaluation in December, 2016, he commented on Dr. Iddins' suitability, and stated that Defendant may want to look outside for someone to replace him, because he was not satisfied with Dr. Iddins' performance in certain areas, including academics. In the third succession plan in December, 2017, the Plaintiff indicated that Dr. Iddins was not ready to succeed him, had not developed in academics sufficiently, and that it would likely take up to ten years for her to attain sufficient academic identity, provided that she applied herself, or words to that effect.

78. The Plaintiff had his last evaluation with his supervisor, Donna Cragle, on April 24, 2018.

79. During that evaluation, they discussed Dr. Carol Iddins' development, and the Plaintiff indicated his disappointment in her development and indicated that she would not be ready to replace him for probably another ten years, if she applied herself. Thereafter, they discussed the Plaintiff's retirement plans, and he indicated that he would not be ready to retire for 8-10 more years. At that point, Dr. Cragle became noticeably cold towards him as she frowned. The Plaintiff replied that even though he was 70 years old that he was in very good health, and he planned to continue working for 8-10 years as long as his health was good. From that point forward, up to the date of Plaintiff's termination, Dr. Cragle's demeanor did not change, the Plaintiff had very little contact with Dr. Cragle, and she did not go out of the way to speak with him.

80. During the last year of Plaintiff's employment, John Crapo, was an employee of National Nuclear Security Administration ("NNSA") at DOE.

81. During the last year of Plaintiff's employment, NNSA oversaw the REAC/TS operation within the Consequence Management ("CM") program.

14

82. The CM program in the Office of Emergency Response at the NNSA, within the DOE, is headed by John Crapo's boss, Dr. Daniel Blumenthal.

83. In effect, NNSA and CM were clients of the Defendant, and they oversaw Defendant's contract within DOE.

84. John Crapo and his boss, Dr. Daniel Blumenthal, knew the Plaintiff and Dr. Carol Iddins.

85. In or about November of 2017, John Crapo sent an email to REAC/TS with a spreadsheet attached requesting the ages of certain REAC/TS employees (hereinafter "Mr. Crapo's Email").

86. John Crapo copied his boss, Dr. Daniel Blumenthal, when he sent his email requesting the ages.

87. Mr. Crapo's Email explained he was requesting ages to determine if assets and capabilities were at risk due to a "maturing work force" (or words to that effect) for REAC/TS, and for the members of the other CM teams.

88. Mr. Crapo's Email requested the ages of Plaintiff, Dr. Carol Iddins, Angie Bowen, and Jason Davis at REAC/TS.

89. At the time, Plaintiff's age was 70, Dr. Carol Iddins' age was about 50, Angie Bowen, RN/Paramedic, was about 35, and Jason Davis, Health Physicist, was about 39.

90. Plaintiff thought Mr. Crapo's request was invasive, inappropriate, and discriminatory, and he did not return the spreadsheet with the ages to Mr. Crapo.

91. Plaintiff explained his feelings to Dr. Carol Iddins about responding to the email and not providing the ages as requested by Mr. Crapo. Thereafter, Dr. Iddins consulted others at the Defendant regarding the Crapo's Email request.

15

92. Plaintiff's supervisor read Mr. Crapo's Email in or about November of 2017.

93. On information and belief, someone returned the spreadsheet to Mr. Crapo providing the requested ages for REAC/TS.

94. As a result of this email, Defendant's management team was aware their client was concerned about the ages of employees at REAC/TS, including the Plaintiff.

95. During Plaintiff's employment, Amanda Hughes was an Administrative Assistant at Defendant.

96. At all times stated herein, Amanda Hughes reported to REAC/TS Business Manager, Mark Jenkins.

97. During Plaintiff's employment, Amanda Hughes' job was to handle all the travel for REAC/TS staff, including Plaintiff, Carol Iddins, Mark Jenkins, Sugarman, Bowen, Davis, Albert Wiley, and Christensen.

98. During Plaintiff's employment, Amanda Hughes prepared and submitted all of Plaintiff's expense reports.

99. During Plaintiff's employment, Amanda Hughes was responsible for making all travel arrangements for employees at REAC/TS.

100. During Plaintiff's employment, Plaintiff deferred to Amanda Hughes on all issues involving travel and his expense reports because that was her job and she had the expertise.

101. During Plaintiff's employment, due to his heavy travel schedule, his wife, Gail Dainiak, helped prepare his flight simulations, and, with Amanda Hughes' permission, his wife interacted with Amanda Hughes regarding Plaintiff's travel.

102. During Plaintiff's employment, it was always Amanda Hughes who would submit Plaintiff's travel plans for approval and who would access Defendant's "online booking tool".

16

103. During Plaintiff's employment, the Plaintiff's wife did not submit Plaintiff's travel plans for approval.

104. During Plaintiff's employment, the Plaintiff's wife never accessed the Defendant's "online booking tool".

105. During Plaintiff's employment, the Plaintiff's wife never made airline reservations for Plaintiff's business travel for Defendant.

106. There is nothing in the Defendant's Travel Manual that prohibits a non-employee assisting an employee with their travel planning.

107. Up until the date of his suspension, as hereinafter alleged, the Plaintiff's wife's interaction with Amanda Hughes on Plaintiff's travel planning was never an issue.

108. During Plaintiff's employment, Amanda Hughes had significant performance issues that Defendant's management team was aware of.

109. In fact, Amanda Hughes' performance issues were one of the reasons Plaintiff's wife assisted her with respect to Plaintiff's travel.

110. In March, 2015, when his employment began, Plaintiff was told that Mark Jenkins, PhD, was the de facto business expert who was assigned control of the REAC/TS budget and was thereafter named Business Manager at REAC/TS.

111. It was common knowledge among REAC/TS staff that Dr. Jenkins had the knowledge, experience and control of the travel policies for REAC/TS, and that Dr. Jenkins made certain that these policies were compliant with DOE and ORAU Policies and Procedures.

112. Further, Dr. Jenkins reviewed and instructed Amanda Hughes to make modifications to individual travel plans, Pre-Authorization (PA) forms, and expense reports to make certain that the policies were followed.

17

113. As a result, Plaintiff always deferred to Amanda Hughes and Dr. Jenkins when it came to travel because it was their area of expertise.

114. At all times herein mentioned, Amanda Hughes was an agent and employee of Defendant.

115. At all times herein mentioned, Dr. Mark Jenkins was an agent and employee of Defendant.

116. During his employment, the Plaintiff was told by Amanda Hughes that travel comparisons were being done for his travel. Then, in or about December 2016, Amanda Hughes told Plaintiff that Dr. Jenkins instructed her that travel comparisons were no longer required.

117. Thereafter, Dr. Jenkins told Plaintiff the same thing, stating that comparisons were not necessary for Plaintiff because travel is always cheaper from bigger cities in Connecticut and Florida (the locations of two of Plaintiff's homes).

118. On May 9, 2018, Plaintiff was requested to report urgently to the Human Relations Department.

119. When he arrived at the Human Relations Department, Plaintiff was surprised to see present awaiting his arrival Harry A. Page, CEO of ORAU, Dr. Vosburg, SVP and Director of ORISE, Mae Mosely, Director of Employee Relations and Diversity, and Jennifer West, with the Travel Department of Integrated Solutions & Services ("ISS"), the company that handles all REAC/TS travel arrangements.

120. After Plaintiff arrived, Mr. Page sternly read a "suspension letter", a copy of which is attached hereto as Exhibit 4.

121. At all times stated herein, Mae Mosely was an agent and employee of Defendant.

122. At all times stated herein, Dr. Vosburg was an agent and employee of Defendant.

18

123. At all times stated herein, Jennifer West was an agent and employee of Defendant.

124. The suspension letter provided, in part:

"**<u>Summary of Incident</u>**
On March 1, 2018, Audit Services was requested to review concerns of potentially inappropriate travel expenses and your wife's inappropriate involvement. Audit Services identified the following:
1. Questionable travel costs totaling $24,184.59 on 26 expense reports as unsupported, excessive, unreasonable, and/or unallowable.
2. Falsified justifications were provided on the expense reports.
3. Multiple violations of ORAU Policy TR-105, which includes the Travel Manual.
4. Your wife was inappropriately involved in your travel.
5. Non-compliance with ORAU Policy LEG-160, which specifies employees should renew their application for outside employment on an annual basis, if applicable.
6. Non-compliance with ORAU policies relating to protection of sensitive information (PII, PHI, OUO, and business sensitive)."
   (*See* Exh. 4).

125. The suspension letter (Exh. 4) then listed the following "Expectations" and "Path Forward":

"**<u>Expectations:</u>**
1. Pending further investigations in the matters stated above, neither you nor your spouse or any representative from your family should be in contact with ORAU/REACTS employees or any customers affiliated with this relationship.
2. All work and related information that may be in your possession pertaining to ORAU and/or REAC/TS should be delivered to Donna Cragle.
3. <u>You will be expected to reimburse ORAU the unallowable cost in the amount of $24,184.59</u>.
**<u>Path Forward:</u>**
Additionally, <u>consequences for failing to meet the expectations in this Suspension</u> could lead to further disciplinary action, up to and including immediate termination." (*See* Exh. 4) (emphasis added).

126. The suspension letter also stated: "Your Suspension is effective as of today, May 9, 2018 and will remain in effect for up to thirty days or until our investigation has been completed." (*See* Exh. 4).

127. Plaintiff's suspension totally blindsided him, leaving him bewildered, humiliated and intimidated.

129. At the suspension meeting, Plaintiff was strongly advised by the CEO, Harry A. Page, not to say anything.

130. At the suspension meeting, Harry A. Page did the talking, and the others seemed to look blankly at the floor or out the window.

131. The suspension meeting lasted about 20 minutes, after which Plaintiff was told to turn over ORAU/DOE Security Clearance badge, mobile phone, and keys to the REAC/TS building, and he was informed that he was forbidden to speak with anyone at REAC/TS.

132. While at or shortly after the suspension meeting, Plaintiff's computers and cell phone were immediately disconnected.

133. At the suspension meeting, Plaintiff was informed he would be allowed to retrieve personal items from his office only with someone from Safeguards and Security (who would call him later).

134. After the termination, Plaintiff repeatedly requested to be provided the audit or even an explanation of the rationale for claiming he had done something wrong, but Defendant failed and refused to provide any additional information. Some of Plaintiff's requests were made pursuant to emails, including an email to the CEO, Harry A. Page, and copies of these emails are attached hereto as Exhibits 5 and 6.

135. Following the suspension, Plaintiff recalled that on May 1, 2018, two staff members from the Travel Department of ISS, Jennifer West and Vickie Caughron, arranged to ask Plaintiff questions regarding a few of the many trips he took for REAC/TS business.

136. At the May 1, 2018 meeting with Ms. West and Ms. Caughron informed Plaintiff that he was flagged because he was a high-volume traveler, and they had some questions regarding a few of the trips. They asserted that they were being extra cautious to protect Plaintiff and ORAU

20

from an OIG audit.

137.    At this meeting with Ms. West and Ms. Caughron, they said one issue involved Plaintiff's upgrades from Coach to Business Class on international trips lasting over 5 hours.

138.    Plaintiff advised Ms. West and Ms. Caughron that having had bilateral knee replacements and a clotting (thrombotic) episode, his risk for life-threatening clotting was higher than that of the general population.  Since Plaintiff's position at REAC/TS required extensive air travel, which often lasted more than 5 hours, with international trips throughout the world, beginning in 2016 when his Security Clearance ("Q" or "top secret" clearance) was approved, the Plaintiff explained that his personal physician was concerned that during prolonged air travel exceeding 5 hours, Plaintiff had the potential to develop blood clots, due to his artificial knee replacements, if he sat in cramped spaces, such as Coach seats in an airplane for extended hours. Plaintiff informed Ms. West and Ms. Caughron that in fact he previously had a life-threatening thrombosis.  Therefore, Plaintiff's doctor wrote a note concerning his need to upgrade his airline tickets to Business Class due to his disability.

139.    Plaintiff advised Ms. West and Ms. Caughron that during Plaintiff's employment, Amanda Hughes would routinely attach a copy of Plaintiff's request for the reasonable accommodation via Plaintiff's doctor's self-explanatory note to requested travel documents that were submitted by Ms. Hughes for approval to the Travel Department/ISS.  (A copy of Plaintiff's physician's note is attached hereto as Exhibit 7).

140.    According to travel policy, these documents were then forwarded to the local DOE in Oak Ridge and the central DOE office in Washington, D.C. for approval, and then returned to ISS.

141.    Plaintiff's request to upgrade from Coach to Business Class was a reasonable

accommodation that was requested and granted, on multiple occasions, prior to his suspension and was common knowledge of Defendant.

142. Plaintiff's history of thrombosis, his potential to develop blood clots, his bilateral knee replacements were disabilities within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

143. Plaintiff's requests to upgrade his airline tickets from Coach to Business Class for flights over five hours due to the medical conditions and disabilities with his legs were requests for a reasonable accommodation within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

144. Allowing Plaintiff's requested accommodations did not impose an "undue hardship" on the Defendant within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

145. With respect to Plaintiff's requests for reasonable accommodations, Defendant had a duty to engage in the interactive process in good faith within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

146. Prior to Plaintiff's termination, the CEO, Harry A. Page, had knowledge of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business Class when the air travel was over five hours due to Plaintiff's medical condition.

147. Prior to Plaintiff's termination, the HR Director, Mae Mosely, had knowledge of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business Class when the air travel was over five hours due to Plaintiff's medical condition.

148. Prior to Plaintiff's termination, the Director of HEE, Dr. Donna Cragle, had knowledge of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business

22

Class when the air travel was over five hours due to Plaintiff's medical condition.

149. Prior to Plaintiff's termination, the staff members of the Travel Department of ISS and Ms. West, had knowledge and/or were aware of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business Class when the air travel was over five hours due to Plaintiff's medical condition.

150. Prior to Plaintiff's termination, the Chief Audit Officer of the Travel Department of ISS, Ms. Caughron, had knowledge and/or were aware of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business Class when the air travel was over five hours due to Plaintiff's medical condition.

151. Prior to Plaintiff's termination, the Administrative Assistant, Amanda Hughes, had knowledge and/or was aware of Plaintiff's requests for his airline tickets to be upgraded from Coach to Business Class when the air travel was over five hours due to Plaintiff's medical condition.

152. Prior to Plaintiff's termination, the Defendant's "Travel Approver", as described in the Travel Manual (Exh. 2), had knowledge and/or was aware of Plaintiff's requests for airline ticket upgrades from Coach to Business Class for air travel exceeding five hours due to Plaintiff's medical condition.

153. Prior to Plaintiff's termination, the Defendant's employees in "Financial Operations" as described in the Travel Manual (Exh. 2), had knowledge and/or was aware of Plaintiff's requests for airline ticket upgrades from Coach to Business Class for air travel exceeding five hours due to Plaintiff's medical condition.

154. In all cases, Defendant's "Travel Approver" as described in the Travel Manual (Exh. 2), approved Plaintiff's requests for upgrades from Coach to Business Class.

23

155. In all cases, DOE's approval for Plaintiff's travel and the upgrades from Coach to Business Class were obtained in advance of the travel.

156. At no time prior to the audit, did employees in Defendant's "Financial Operations" as described in the Travel Manual (Exh. 2) ever question Plaintiff's upgrades from Coach to Business Class.

157. Plaintiff explained to Ms. West and Ms. Caughron that no upgrades to Business Class were made without prior DOE and ISS approval, and that all upgrades were given as a reasonable accommodation due to Plaintiff's disability.

158. The "audit" by Ms. West and Ms. Caughron, was referenced in Plaintiff's suspension letter (attached as Exh. 2), and the upgrades were used against Plaintiff (given the extremely high dollar amount for alleged "overcharges" or "unallowable costs"), even though the upgrades had been approved in advance by the "Travel Approver" as referenced in the Travel Manual (Exh. 2), and had never been questioned by "Financial Operations" as referenced in the Travel Manual, and by DOE as a "reasonable accommodation" for Plaintiff's disabilities.

159. Further, as stated in the Suspension letter (Exh. 4), Defendant demanded Plaintiff pay $24,184.59 as its "Expectations" for his continued employment pursuant to the "Path Forward".

160. Prior to his termination, Defendant inexplicably refused several times to provide Plaintiff with a copy of the travel audit or any details of the alleged $24,184.59 that Defendant claimed he owed so that he could review their assertions, and/or provide explanations, and/or provide receipts.

161. As far as Plaintiff knew, he did not owe $24,184.59 to Defendant because the upgrades from Coach to Business related to his disability, were a reasonable accommodation, and

24

had <u>all</u> been previously approved by DOE, all of which Defendant fully understood.

162. Astonishingly, as previously alleged, Plaintiff was told on several occasions that he could not have, and would never have, the audit or details regarding the calculations of the alleged overcharges, or other details, even though Defendant demanded payment of $24,184.59! (*See* Exhs. 5 and 6).

163. On May 16, 2018, at 11:39 a.m., Plaintiff sent an email to CEO, Harry A. Page, again reiterating his request for the details of what led to his suspension so that he could address any misunderstandings. (*See* Exh. 6).

164. Mr. Page received Exh. 6.

165. In this May 16, 2018 email to Mr. Page, Plaintiff also stated that he was concerned that he was being discriminated against due to his age and/or disability. (*See* Exh. 6).

166. Plaintiff's email of May 16, 2018 (Exh. 6) constitutes a complaint of discrimination.

167. Mr. Page never responded to Plaintiff's May 16, 2018 email (Exh. 6).

168. Defendant's suspension letter to Plaintiff (Exh. 4) had numerous errors and falsehoods that he could have corrected had he been given the opportunity prior to his termination.

169. Further, at no time did Plaintiff ever submit or direct anyone to submit falsified justifications for travel.

170. During the audit leading to Plaintiff's termination, Amanda Hughes <u>admitted</u> she had submitted falsified paperwork in connection with Plaintiff's expense reports, but Plaintiff did not know this, he did not request this, and he would have instructed her not to do so had he been asked.

171. At no time was Amanda Hughes disciplined for submitting falsified paperwork in connection with Plaintiff's expense reports.

172. Amanda Hughes is substantially younger than Plaintiff.

173. At no time prior to Plaintiff's termination was he told that Amanda Hughes had admitted to submitting falsified documentation with respect to his requests.

174. Defendant has audited the expense reports and travel of younger employees, but, on information and belief, these younger employees were allowed to respond to allegations and provide receipts or other explanation, and to Plaintiff's knowledge none of these younger employees were terminated or disciplined.

175. Instead of responding to Plaintiff's May 16, 2018 email (Exh. 6), Mr. Page curtailed the "investigation", and Plaintiff was fired on May 16, 2018.

176. Pursuant to the May 9, 2018 suspension letter (Exh. 4), the "investigation" was supposed to take up thirty (30) days.

177. As stated in the May 9, 2018 suspension letter (Exh. 4), it provided a "Path Forward".

178. However, after Plaintiff complained of age and disability discrimination, he was abruptly fired without being given an opportunity to review the audit or address the false accusations in the suspension letter.

179. Even though Plaintiff met all requirements of the "Path Forward" as stated in the suspension letter (Exh. 4), except he did not pay ORAU the $24,184.59 that had been demanded because he was not afforded an opportunity to address the specifics or provide receipts, Plaintiff was informed during the afternoon of May 16, 2018, that he was being terminated.

180. The Defendant failed and refused to show Plaintiff the audit or provide any details regarding the audit yet demanded that he pay $24,184.59.

181. Defendant abruptly fired the Plaintiff on May 16, 2018.

26

182. Plaintiff was thereafter provided a separation notice stating that he was "discharged for cause". (A copy of the Separation Notice is attached as Exhibit 8).

183. To the date of the filing of this Complaint, Defendant at no time provided Plaintiff the actual audit.

184. In the case of Plaintiff's "Travel Approver", at no time did the Travel Approver indicate to Plaintiff that any of his travel arrangements or expenses were inappropriate.

185. In the case of Plaintiff's travel, all the travel referenced in the Suspension letter (Exh. 4) had been approved in advance by Defendant's "Travel Approver" as described in the Travel Manual (Exh. 2).

186. With respect to the allegations concerning Plaintiff as set forth in the Suspension letter (Exh. 4), the "Travel Approver" as described in the Defendant's Travel Manual was not disciplined or counseled in any manner.

187. In the case of Plaintiff's travel, all the travel mentioned in the Suspension letter had been sent to "Financial Operations" as referenced in the Travel Manual (Exh. 2), and none of their audits ever raised any issue prior to his termination.

188. With respect to the allegations concerning Plaintiff as set forth in the Suspension letter (Exh. 4), no employees in "Financial Operations" as described in the Defendant's Travel Manual were disciplined or counseled in any manner.

189. Financial Operations, as described in the Travel Manual, is supposed to conduct an audit of all foreign and domestic travel reimbursements within ten (10) days. (*See* Exh. 2).

190. Prior to his termination, on more than one occasion, Plaintiff requested that as a reasonable accommodation he be allowed to upgrade air travel of more than five hours from Coach to Business Class, but at no time did the Defendant engage in an interactive process in good faith

27

regarding these requests.

191.  The Suspension letter (Exh. 4) contained numerous falsehoods and was trumped-up and was a pretext used to terminate Plaintiff due to his age so he could be replaced with a younger employee.

192.  On information and belief, following Plaintiff's suspension, the Defendant communicated in writing to the Office of Inspector General ("OIG"), DOE, and to others about Plaintiff's alleged fraud and abuse, including providing the Suspension letter (Exh. 4), and his termination letter.

193.  The information Defendant provided as set forth in Paragraph 192 was defamatory.

194.  The information Defendant disseminated as set forth in Paragraph 192 was read by persons at OIG, DOE, and by others who understood its defamatory meaning and that it referred to Plaintiff.

195.  The allegations in the Suspension letter (Exh. 4) were a pretext used to wrongfully terminate the Plaintiff.

196.  The Defendant was either negligent or acted recklessly in failing to determine if the statements were true before communicating them, or that the Defendant knew the statements were false before communicating them.

197.  The Plaintiff was injured by the communication of the statements.

198.  The communications regarding the Plaintiff were false.

199.  Further, by disseminating the unfounded accusations that Plaintiff had falsified justifications for his travel and otherwise had engaged in the conduct described in the Suspension letter (Exh. 4), Defendant placed Plaintiff in a false light to his peers, to DOE, to OIG, to his clients, and to his colleagues.  These actions were taken against the Plaintiff at the pinnacle of his career,

28

at an advanced age, giving him no chance to defend himself.

200. Defendant's cruel and vindictive actions were such that they would be highly offensive to a reasonable person, and Defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the Plaintiff would be placed.

201. The abusive, vindictive and harsh nature of Plaintiff's suspension and termination, including the fraudulent and illegal demands for $24,184.59 that he did not owe as a condition of keeping his job, were designed to inflict maximum personal and financial injury to Plaintiff and to destroy the reputation he had worked so hard to develop over his 45-year career as a physician scientist since graduating from medical school.

202. Following his termination, Plaintiff was informed to stay off the premises.

203. Upgrading from Coach to Business Class on flights over five hours due to Plaintiff's disabilities, as described herein, is a reasonable accommodation as defined by the laws and regulations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

204. Following Plaintiff's termination, his attorney sent a Non-Spoliation Notice to Defendant requesting that certain evidence be preserved. A copy of this notice is attached hereto as Exhibit 9.

205. Defendant received the Notice of Non-Spoliation (Exh. 9).

206. Following Plaintiff's termination, the younger employee that he had mentored, Dr. Carol Iddins, replaced Plaintiff as acting Director, she thereafter replaced him as Director. Dr. Iddins' age was approximately 50, twenty years younger than the Plaintiff.

207. Following Plaintiff's termination, Plaintiff was replaced by Dr. Iddins.

208. Plaintiff was more qualified than Dr. Iddins for the Director position.

209. The real reason for Plaintiff's termination was due to his age so he could be replaced

29

with a younger employee, Dr. Iddins, and/or to retaliate against him for complaining of age and disability discrimination. Additionally and alternatively, Plaintiff was terminated due to his disability, because Defendant regarded him as being disabled, because he had a record of a disability, because he needed and requested a reasonable accommodation, because Defendant refused to engage in the interactive process in good faith, and in retaliation for requesting a reasonable accommodation and for complaining about disability discrimination.[1]

210. Plaintiff was terminated due to his age and/or in retaliation for complaining of age discrimination in violation of the Age Discrimination Employment Act 29 U.S.C. § 621, *et seq*., and/or due to his disability, and/or because he was regarded as disabled, and/or because he had a record of disability, and/or because he requested and needed a reasonable accommodation, and/or in retaliation for complaining of disability discrimination, and/or because Defendant refused to engage in the interactive accommodation process regarding his request for a reasonable accommodation in good faith in violation of the Americans with Disabilities Act 42 U.S.C. § 12101, *et seq.* The Defendant's conduct also violates the Tennessee Disabilities Act Statute, Tenn. Code Ann. § 8-50-103, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

211. Plaintiff also sues Defendant for defamation and for false light invasion of privacy.

212. At all times pertinent herein, Defendant had knowledge that its actions were in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

213. As a result of the above conduct, Plaintiff sues Defendant for violating the Age

---

[1] Plaintiff has also filed an appropriate discrimination and retaliation EEOC Charge pursuant to the ADA, 42 U.S.C. § 12101, *et seq.*, but he has not yet received his Notice of Right to Sue from the EEOC. The Plaintiff mentions the ADA in this Complaint to provide notice to Defendant and to this Honorable Court that he intends to ask this Honorable Court for leave to amend this Complaint to include ADA claims once he receives the Notice of Right to Sue from the EEOC.

Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and pursuant to the Tennessee Disabilities Act, Tenn. Code Ann. § 8-50-103, and Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*, as well as for defamation and false light invasion of privacy under Tennessee law.

214. As a result of the discriminatory and retaliatory actions set forth herein, the Plaintiff filed a timely Charge of age and disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (A true and exact copy of the Charge is attached as Exhibit 10 and same is incorporated herein by reference).

215. Audits should be conducted fairly and honestly.

216. Employers, like Defendant, must conduct fair, honest, and unbiased investigations.

217. Employees should be allowed to respond to questions about audits or accusations of fraud.

218. Employers, like Defendant, must never blackmail or extort their employees.

219. Employers, like Defendant, have a duty to eradicate discrimination in the workplace.

220. Employers, like Defendant, should not discriminate against employees due to age or disability.

221. Employers, like Defendant, should not discriminate against older employees.

222. The EEOC Charge filed by Plaintiff was timely filed.

223. More than sixty (60) days have elapsed since the filing of Plaintiff's EEOC Charge.

224. This suit is timely filed.

225. Defendant's actions violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* As an independent, alternative and supplemental cause of action, the Plaintiff

31

avers that the Defendant violated the provisions of Tenn. Code Ann. § 4-21-101, *et seq,* and the Tennessee Disabilities Act, § 8-50-103, *et seq*.

226.    [Reserved for ADA allegations after receipt of the Notice of Right to Sue from the EEOC.]

227.    As a direct and proximate result of the Defendant's actions as alleged herein, the Plaintiff suffered great and irreparable loss of tangible job benefits, including a loss of income and benefits, both past and future, and he sustained other pecuniary losses.

228.    As a direct and proximate result of the Defendant's actions as alleged herein, the Plaintiff has sustained, and will continue to sustain, great emotional distress, and humiliation and embarrassment, damage to reputation and character.

229.    Defendant knew or showed reckless disregard that its conduct, as alleged herein, violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*., sufficient to justify the imposition of liquidated damages.

230.    Defendant's actions were reckless, intentional, and malicious sufficient to justify an award of substantial punitive damages.

231.    [Reserved from punitive damages allegations pursuant to the ADA.]

WHEREFORE, Plaintiff prays for the following relief:

1.    Compensatory damages, including front pay, (or in the alternative reinstatement if the Court deems it appropriate, Plaintiff respectfully submits that given Defendant's actions as alleged herein, that reinstatement would not be appropriate).

2.    Liquidated damages.

3.    Punitive damages.

4.    Prejudgment interest.

32

5. Reasonable attorney's fees.

6. The costs of this action.

7. A jury to try this cause.

8. A mandatory injunction to issue prohibiting the Defendant from engaging in age and disability discrimination; ordering ORAU the return to Plaintiff of intellectual properties, including patent applications that were initiated during employment at ORAU; ordering ORAU to notify the OIG in writing with copy to Plaintiff indicating that its notification of the OIG regarding Plaintiff's conduct was an error on the part of ORAU; ordering ORAU to change Plaintiff's employment status from "Termination with Cause" to "Voluntary Resignation"; ordering ORAU to return to Plaintiff of all educational and scientific presentations that were prepared by Plaintiff during his employment at ORAU; ordering ORAU to assist Plaintiff in having his Q-Clearance reinstated; and requiring other said remedial actions as this Honorable Court deems appropriate.

RESPECTFULLY SUBMITTED this the 9th day of May, 2019.

**THE BURKHALTER LAW FIRM, P.C.**

s/David A. Burkhalter, II
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Zachary J. Burkhalter, BPR #035956
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974

33